In the Matter of the Estate of EDWARD H. PERKINS, Deceased.

Surrogate's Court, New York County, March 26, 1929.

*Prentice & Townsend,* for the petitioner.

*Chadbourne, Stanchfield & Levy,* for the executors of Mary N. Perkins, deceased.

*William V. Saxe* [*Sherwood E. Silliman* of counsel], for Margaret Pearce.

*Langdon P. Marvin,* special guardian [*Langdon P. Marvin, Joseph K. Savage* and *Richard S. Emmet* of counsel].

*Masten & Nichols* [*Edward N. Perkins* of counsel], for the executors of Norton Perkins.

*Emmet, Marvin & Martin,* for Edward and James Pearce.

O'BRIEN, S. In this trustees' accounting several objections relating to stock dividends and their distribution between principal and income were filed by the special guardian all of which have been disposed of by stipulation and consent except one. This objection refers to a stock dividend made by the Fifth Avenue Bank on June 5, 1918, of 1,000 shares and raises the questions whether all of said stock dividend should be allocated to principal as contended by the special guardian or whether an apportionment between principal and income, viz., between life tenant and remaindermen should be made. These questions are submitted upon an agreed statement of facts. The stipulation embodies all of the essential facts requisite for a determination of these questions

and includes transcripts from the books of the Fifth Avenue Bank showing the financial status of said bank on certain pertinent dates hereinafter referred to, two resolutions of the stockholders of said bank authorizing the payment of said stock dividend and the following paragraphs:

" The intrinsic value of the stock of the Fifth Avenue Bank exceeded the intrinsic value at which said stock originally was received in this trust until after the increase of the capital stock on June 5th, 1918, as aforesaid, but after such date it had dropped below said original intrinsic value of said stock in this trust. * * * "

" If it should be determined that the 25-80/1000 shares of stock received by the trustees on June 11, 1918, should be apportioned between the principal and the income of the trust, such apportionment should give to the corpus of the trust $33\frac{165}{1000}$ shares, and to the income $16\frac{995}{1000}$ shares with an intrinsic value of the trust investment on April 12, 1902, of $48,535.72, as ascertained in the recalculation made by the trustee and attached hereto and made a part of this Agreed Statement of Facts. * * * "

IMPAIRMENT OF CORPUS OF TRUST AND NUMBER OF SHARES REQUIRED TO MAKE GOOD THE IMPAIRMENT.

| | |
|---|---:|
| The book or intrinsic value of the investment at the time of the creation of the trust................... | $48,535 72 |
| Deduct the book value of the investment after payment of $4\frac{1}{2}$ per cent stock distribution and 100 per cent stock dividend............................. | 36,703 33 |
| The difference is the amount of the impairment of the corpus of the trust............................... | 11,832 39 |
| Divide the impairment by the book value per share, after above stock dividend...................... | 1,463 45 |
| The quotient is the number of shares required to make good the impairment (par $100).................. | 8.085 |
| Add the number of shares originally held in trust (24) plus *pro rata* share as indicated above.............. | 25.080 |
| *Equals number of shares that the trustee should hold in trust for the remaindermen (par $100).............. | 33.165 |
| Number of shares originally held in trust............ | 24 |
| Add the number of shares received on May 4, 1914, as our proportion of the distribution of the 43 shares above referred to, which the bank had charged off as an asset in 1906 and turned over to trustees for it or its stockholders. The distribution having been ratably among the shareholders, there was no cash increment to the capital of this trust......... | 1.080 |

| | |
|---|---|
| Add the number of shares received by 100 per cent stock dividend............................... | 25.080 |
| Total number of shares received by trustees par $100.. | 50.160 |
| Deduct number of shares originally held in trust, and number required to make good impairment........ | 33.165 |
| *The difference is the number of shares which the life beneficiaries are entitled to receive*.................. | 16.995 |

Multiply the number of shares to be held in trust, 33.165 (par $100), by the book value per share, $1,463.45, after the $4\frac{1}{2}$ per cent stock distribution and 100% stock dividend, and the product is $48,535.32. The original book value of the investment was $48,535.72.

Thus it appears that there is an agreement as to the method of the apportionment to be adopted should the court hold that there must be an apportionment. The Fifth Avenue Bank was incorporated on July 22, 1875, with a capital stock of the par value of $100,000 and a surplus of another $100,000 so that each stockholder paid $100 for each share of stock and contributed $100 towards the " surplus fund " of the bank. *The testator died on April 12, 1902,* leaving a will in which he created a trust for the life of Mary Norton Perkins and such trust was properly set up as of the date of his death. Part of the capital of this trust fund consisted of twenty-four shares of stock or twenty-four one-thousandths of all the then outstanding shares of the Fifth Avenue Bank. In 1914 the trust received as a dividend one and eighty one-thousandths shares. All parties concede that this one and eighty one-thousandths shares belongs to the remaindermen for the reason that it was declared out of forty-three shares which were purchased by the bank and carried as part of its capital prior to the institution of the trust and later redistributed among holders of the remaining nine hundred and fifty-seven shares held by the various stockholders. In 1918 the bank increased its capital from $100,000 to $200,000 and issued one thousand additional shares of the par value of $100 each which were distributed as a stock dividend, the trustees of this trust receiving twenty-five and eighty one-thousandths shares of the stock of the Fifth Avenue Bank as their proportion of the stock dividend so that they then held a total of fifty and one hundred and sixty one-thousandths shares. They sold one hundred and sixty one-thousandths of a share in 1919 and they now hold fifty shares. The trustees originally in their account allocated thirty and twenty-one one-thousandths of these shares to the principal of the trust and twenty and one hundred and thirty-nine one-thousandths to the income thereof

but on a recalculation these figures have been changed by the stipulation and the correct division, *if one is to be made*, is to allocate to the principal of the trust thirty-three and one hundred and sixty-five one-thousandths shares and to the income account sixteen and nine hundred and ninety-five one-thousandths shares. The special guardian's contention as we have already noted, is that all of this stock dividend should be allocated to the principal account. The argument set forth in his learned and exhaustive brief offers many and various considerations in support of his position but the dominant argument is developed out of his premise that the action taken by the stockholders and directors in 1918 determined the nature of the transaction. Expressed in brief terms his argument is that the stock dividend in question was issued against the " Surplus Fund " was " a readjustment of capital, a matter of bookkeeping " and " had nothing whatsoever to do with the accumulated earnings or undivided profits of the bank." As the chief support of these contentions he points to that part of the resolutions adopted by the stockholders which reads as follows:

" ' *Therefore*, be it *Resolved*, that the additional shares of stock, to consist of one thousand (1,000) shares of the par value of One Hundred Dollars ($100) each, aggregating One Hundred Thousand Dollars ($100,000), be issued against the paid in Surplus Fund of this Bank as a readjustment of its capital, and not against any accumulated earnings, and that the original premium paid in by the stockholders at the organization of this Bank, amounting to the sum of One Hundred Thousand Dollars ($100,000) be applied in full payment for the said stock, which said shares of stock shall be then distributed to the stockholders in proportion to their respective holdings at the close of business on the 5th day of June, one thousand nine hundred and eighteen; and be it further

" ' *Resolved*, that the President and Cashier of this Bank be and they are hereby authorized and directed to issue the said stock to the stockholders of this Bank appearing on the records thereof at the close of business on the 5th day of June, one thousand nine hundred and eighteen, in proportion to their respective holdings, and be it further

" ' *Resolved*, that simultaneously with the use of the said Surplus Fund of One Hundred Thousand Dollars ($100,000) in payment for the additional one thousand shares of the capital stock of this Bank, the sum of Two Million Dollars ($2,000,000) be transferred from the Profit and Loss Account as appearing on the books of this Bank to its said Surplus Fund.' "

After a careful consideration of all of the arguments set forth in the scholarly briefs submitted, I have concluded that the stock

dividend was in reality issued against accumulated and undivided profits and that it should be apportioned between income and principal. While the special guardian correctly quotes and is able to find some support in that part of the resolution to which he refers he overlooks entirely the weight and the significance of the other part of the resolution *simultaneously* adopted by the stockholders which transferred $2,000,000 to the surplus fund from the profit and loss account. It is clear that while in form the stock in question was issued against the surplus fund, in reality it was issued against accumulated and undivided earnings. Right here it is important to note that on April 11, 1902 (the trust was effective as of April 12, 1902), the undivided profits were $1,420,176. Resolution No. 2 transferred to the surplus fund $2,000,000 of undivided profits and *thus made it possible to have a stock dividend and maintain the necessary surplus fund.* We must look beyond the form of resolutions and the *modus operandi* used for the distribution of funds to determine the question before us. The principle applicable here is clearly and cogently expressed in Thompson on Corporations (2d ed. § 5414), viz.: " The courts now inquire into the actual nature and source of dividends for the purpose of determining their character, and as between the life tenant and remainderman if they are found to represent earnings that accrued prior to the creation of the trust, they belong to the corpus of the trust; or if they represent the natural growth and increase in the value of the corporate plant and business, whether that growth and increase took place before or after the trust was created, they are to such extent capital. The court, in making the inquiry, concerns itself with the substance of the transaction, and not the form in which the corporation has seen fit to clothe it, and the fact that a dividend is distributed in cash or stock is said to be of little importance in determining whether it is capital or income. * * * The object of the inquiry in every case should be to do justice to the life tenant and remainderman and at the same time effectuate the intention of the creator of the trust; and on this theory, in order to effectuate such intention and to do justice between the parties, a court may, under the circumstances of a given case, apportion a dividend between the life tenant and the remainderman." In view of all the facts and circumstances surrounding this stock dividend and of all the facts set forth in the agreed statement, I hold that said stock dividend must be apportioned between life tenant and remaindermen (*Matter of Osborne,* 209 N. Y. 450; *U. S. Trust Co.* v. *Heye,* 224 id. 242) in accordance with the formula and figures set forth in said agreed statement in part quoted above. Proceed accordingly.